IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Civil Action No.

NORTHWEST PARKWAY PUBLIC HIGHWAY AUTHORITY,

      Plaintiff,

v.

BAYERISCHE HYPO-UND VEREINSBANK AG, New York Branch

      Defendant.

---

## COMPLAINT

Northwest Parkway Public Highway Authority (the "Authority"), through its attorneys Kutak Rock LLP, for its Complaint, hereby states and alleges as follows:

### I.  PARTIES

1.      Plaintiff, Northwest Parkway Public Highway Authority (the "Authority"), is a body corporate and politic of the State of Colorado, and a political subdivision thereof, created in 1999 pursuant to the Colorado Public Highway Authority Law, C.R.S. § 43-4-5, *et seq.*

2.      Defendant, Bayerische Hypo- und Vereinsbank AG, New York branch ("Hypo Bank"), is a corporation organized under the laws of Federal Republic of Germany, with its principal United States place of business at 150 East 42nd Street, New York, New York.

## II.  JURISDICTION AND VENUE

3.      Jurisdiction is proper in this Court pursuant to 28 U.S.C. § 1332(a)(2), because the parties are citizens of a State and citizens or subjects or a foreign state, and the amount in controversy exceeds the sum or value of $75,000, exclusive of interest and costs.

4.      Venue is proper in this Court pursuant to 28 U.S.C. § 1391(a) because a substantial part of the events or omissions giving rise to the claim set forth herein occurred within the State of Colorado.

## III.  GENERAL ALLEGATIONS

5.      The Authority was created in 1999 pursuant to the Colorado Public Highway Authorities Law, C.R.S. § 43-4-5, for the purpose of constructing and operating a toll road connecting E-470 at Interstate 25 to U.S. 36 (the "Northwest Parkway").  The Authority was formed by three member jurisdictions, the City and County of Broomfield, City of Lafayette and Weld County, Colorado.

6.      In 2001, the Authority issued approximately $416,392,070 in revenue bonds (the "Bonds") for the development, design and construction of the Northwest Parkway, as well as to fund certain operating costs and future debt service requirements related to the Northwest Parkway.

7.      In connection with the issuance of the Bonds, on June 1, 2001 the Authority entered into a Master Trust Indenture (the "Master Indenture") with Wells Fargo Bank West, N.A., as trustee ("Wells Fargo"), pursuant to which Wells Fargo was to hold, invest and disburse monies received in connection with the Bonds for the benefit of holders of the Bonds.  A true and correct copy of the Master Indenture is attached hereto as **Exhibit A**.

8.     Pursuant to the Indenture, certain accounts were created which were to be managed by Wells Fargo, including a "Senior Bonds Debt Service Reserve Account" (the "Reserve Account") which was intended to hold funds for future debt service payments on the outstanding Bonds as such payments became due.  The Reserve Account for the Bonds totaled approximately $36 million.

9.     Pursuant to Section 5.05(c) of the Master Indenture, on June 28, 2001, Wells Fargo entered into a Debt Service Reserve Account Forward Delivery Agreement ("Forward Delivery Agreement") with Hypo Bank.  The Forward Delivery Agreement was an investment contract  pursuant to which Wells Fargo would deliver the sums held in the Reserve Account to Hypo Bank, which in turn would provide Wells Fargo with certain eligible securities (the "Securities").  The principal and interest on the Securities, which upon information and belief were purchased at discounted rates by Hypo Bank,  were guaranteed to provide interest at a rate of 6.42 percent per annum based on a 30/360 interest calculation method (the "Guaranteed Rate").  A true and correct copy of the Forward Delivery Agreement is attached hereto as **Exhibit B.**

10.     The Securities were to mature every six months, on or before June 15 and December 15.  At maturity, the Securities would pay an amount not to exceed the amount of the Reserve Account plus interest at the Guaranteed Rate.

11.     The Forward Delivery Agreement contemplated that Wells Fargo would continue to invest the amounts in the Reserve Account with Hypo Bank every six months while the Bonds were outstanding.  Pursuant to Section 6.11 of the Forward Delivery Agreement, however, at the

end of ten (10) years, or on June 15, 2011 (the "Trigger Date"), either party could terminate the Forward Delivery Agreement without penalty.

12.     Pursuant to Section 2.05 of the Forward Delivery Agreement, the Forward Delivery Agreement could be terminated prior to the Trigger Date if the bonds were redeemed, defeased, repurchased or refunded.

13.     In the event of an early termination of the Forward Delivery Agreement, Hypo Bank was required to fix a "Termination Amount" based on a procedure set forth in Section 1.01 of the Forward Delivery Agreement.  This required Hypo Bank to solicit bids from at least three dealers, as defined in the agreement, of the value of the Forward Delivery Agreement as of the date of the termination of the agreement, and then calculate the arithmetic mean of the three bids. The "bids" solicited were, in essence, the amount that the other dealers would be willing to pay, or the amount they would require in payment, to assume Hypo Bank's obligations and succeed to Hypo Bank's rights under the Forward Delivery Agreement as of the termination date.  Because the value of agreements such a the Forward Delivery Agreement is driven by the interest rates that must be paid, if the interest rate rises, it is expected that the value of the agreement would increase, meaning the arithmetic mean of the bids would be a positive number.  Conversely, if the interest rate falls, it is expected that the value of the agreement would decrease and the arithmetic mean of the bids would be a negative number.  Pursuant to Section 2.05 of the Forward Delivery Agreement, if the arithmetic mean of the three bids was expressed as a negative number, Hypo Bank would be required to pay a Termination Amount to Wells Fargo in that sum, and if the arithmetic mean of the bids were expressed as a positive number, Wells

Fargo would be required to pay a Termination Amount in that sum to Hypo Bank.  Accordingly, Section 4.03 of the Forward Delivery Agreement provided:

> Each of the Trustee [Wells Fargo] and Provider [Hypo Bank] understands that if under any of the circumstances provided herein, a Termination Amount would be due from the Trustee or Provider, the size of such Termination Amount will vary depending, in large part, on the prevailing interest rates at the time such Termination Amount is calculated.  Under certain market conditions the amount of the Termination Amount owed to the Provider or to the Trustee by, as applicable, the Trustee or the Provider, could be substantial.

14.     On or about October 19, 2007, Wells Fargo provided notice to Hypo Bank that the Bonds were to be defeased on November 19, 2007 and the Forward Delivery Agreement was to be terminated.  Pursuant to Section 2.05 of the Forward Delivery Agreement, Wells Fargo requested that Hypo Bank calculate the Termination Amount pursuant to the Agreement.  A true and correct copy of this notice letter is attached hereto as **Exhibit C**.

15.     On or about November 15, 2007, Hypo Bank acknowledged Wells Fargo's Notice of Termination.  However, Hypo Bank refused to calculate or to pay a Termination Amount.  Specifically, Hypo Bank stated that "we dispute the trustee's contention that it is owed a Termination Amount by us under the agreement, thus, no such payment will be made."  A true and correct copy of Hypo Bank's response to Wells Fargo's notice letter is attached hereto as **Exhibit D**.

16.     The Bonds were defeased on or about November 21, 2007 and the Forward Delivery Agreement has been terminated.  Hypo Bank has refused to calculate or to pay any Termination Amount as required by Section 2.05 of the Forward Delivery Agreement.

17.     Because the prevailing interest rates had declined substantially from the date the Forward Delivery Agreement was entered, the Authority believes that the Termination Amount

as of the date the Bonds were defeased would have been a negative number, and that Hypo Bank would therefore have been required to pay a Termination Amount to Wells Fargo. The Authority believes that the value of the Termination Amount would have been approximately two million dollars as of the date the Bonds were defeased.

18.   The funds held by Wells Fargo as Trustee under the Indenture, including the Reserve Account, and any Termination Amount paid to Wells Fargo as Trustee under the Indenture, were at all times the property of the Authority. Accordingly, the Authority is the real party in interest with respect to this action, which seeks payment of the Termination Amount from Hypo Bank. To clarify the Authority's entitlement to pursue these claims, on or about August 23, 2008, Wells Fargo assigned all right, title and interest under the Reserve Account Agreement to Hypo Bank to allow Hypo Bank to pursue claims for the payment of the Termination Amount.

### FIRST CLAIM FOR RELIEF
### (Breach of Contract)

19.   The Authority incorporates the allegations of paragraphs 1 through 18 of the Complaint as if fully set forth herein.

20.   The Forward Delivery Agreement is a binding and enforceable contract.

21.   The Authority, as real party in interest with respect to the funds invested pursuant to the Forward Delivery Agreement, and as assignee of Wells Fargo's rights under the Forward Delivery Agreement, is entitled to enforce the obligations of the Forward Delivery Agreement.

22.   Hypo Bank has breached its obligations under the Forward Delivery Agreement by its failure to calculate a Termination Amount in accordance with Section 2.05 of the Forward

Delivery Agreement and to remit the Termination Amount to Wells Fargo on behalf of the Authority following the defeasance of the Bonds.

23.     Wells Fargo and the Authority have complied with all conditions precedent to the enforcement of the obligations under the Forward Delivery Agreement.

24.     As a result of Hypo Bank's breach of its contractual obligations under the Forward Delivery Agreement, the Authority has incurred substantial losses in an amount that may be proved at trial.

**SECOND CLAIM FOR RELIEF**
**(Declaratory Relief)**

25.     The Authority incorporates the allegations of paragraphs 1 through 24 of the Complaint as if fully set forth herein.

26.     An actual case or controversy exists as to the parties' rights and obligations under the Forward Delivery Agreement as they pertain to the payment of a Termination Amount as a result of the defeasance of the Bonds.

27.     The Authority is entitled to a declaration that:

(a) Hypo Bank was obligated to calculate a Termination Amount in connection with the defeasance of the Bonds as of November 21, 2007; and

(b) That the Termination Amount would have been expressed as a negative number and, accordingly, Hypo Bank would have been obligated to pay the Authority as Assignee of Wells Fargo, a Termination Amount; and

(c) The amount of that Termination Amount.

WHEREFORE, Plaintiff Northwest Parkway Public Highway Authority prays that judgment enter in its favor and against Hypo Bank on the claims set forth herein, and that it be awarded monetary damages and declaratory relief as described herein, in addition to its costs, reasonable attorneys' fees and such other and further relief as the court deems just and proper under the circumstances.

Dated this 26th day of August, 2008.

KUTAK ROCK LLP


By:     _s/Craig N. Johnson_____
                Craig N. Johnson
                Suite 3100
                1801 California Street
                Denver, CO  80202-2626
                (303) 297-2400 (Telephone)

ATTORNEYS FOR PLAINTIFF